Klaus TSCHIRA and Gerda Tschira,
Plaintiffs–Appellees,

v.

Ben H. WILLINGHAM, Jr. and Corim, Inc., Defendants–Appellants.

No. 96–5537.

United States Court of Appeals,
Sixth Circuit.

Argued April 24, 1997.

Decided Feb. 3, 1998.

Grant Smith (argued and briefed), John A. Ascione (briefed), Smith & Ascione, Nashville, TN, for Defendants–Appellants.

Paul E. Summit (argued and briefed), Graham & James, New York City, Barbara J. Moss (briefed), Gullett, Sanford, Robinson & Martin, Nashville, TN, for Plaintiffs–Appellees.

Before: MERRITT, RYAN, and FLOYD R. GIBSON,* Circuit Judges.

## OPINION

FLOYD R. GIBSON, Circuit Judge.

In this case, a jury found that Appellants, Corim, Inc. a real estate investment firm, and its President, Ben H. Willingham, Jr.,[1] breached a fiduciary duty and committed fraudulent misrepresentation during the course of a real estate transaction between Appellants and Appellees, Klaus and Gerda Tschira,[2] citizens and residents of Germany. Appellants contend that the district court made the following errors: (1) incorrectly instructed the jury that a fiduciary relationship existed between Willingham and the Tschiras; (2) improperly allowed the Tschiras to introduce into evidence bank statements tending to show Corim's deception of other investors; (3) incorrectly refused to direct a verdict in appellants' favor on the issue of intentional misrepresentation; and (4) improperly refused to answer several questions posed by the jury during deliberations; and (5) improperly refused to grant Appellants' post-trial motion to interrogate the jury. Because we conclude that the district court[3] ruled correctly on each of these issues, we affirm.

In 1988, Klaus Tschira benefitted financially when the company he helped to create, SAP AG ("SAP"), went public in Germany. In search of investment opportunities, Klaus learned through a German real estate bro-

ker, Claus Schenk, that Appellants were soliciting investors for commercial property in the southeastern United States. Intrigued by this information, Klaus, who was joined by other SAP founders, attended a meeting in Walldorf, Germany at which Willingham, who speaks fluent German, made a presentation. According to trial testimony, Willingham explained that Corim proposed to obtain buildings for purchase by investors at a "fair market price"; Corim then intended to enter into management contracts with the new owners. By the terms of the management contracts, Corim and Willingham would lease the buildings from the investors and, in return, would then pay the investors a contractually established rent amounting to approximately eight percent annually of the purchase price of the building. Klaus testified that he inquired as to how Willingham and Corim would earn a profit, and Willingham responded that Corim would receive revenue via the difference between the rents Corim would charge for its subleases and the rent Corim itself paid the investors.

The Tschiras found the investment attractive and initially agreed to buy four buildings in various southern cities and lease those properties back to Corim. The Tschiras did not procure independent American counsel for these transactions, as they claim to have regarded Willingham as their trusted agent. Indeed, whether Willingham was or was not the Tschiras' agent is a disputed issue in this case. The controversy centers around a Letter (the "Letter") which was originally drafted by Berthold Wipfler, the Tschiras' tax advisor, and which the parties used in each of their transactions. The Letter, transcribed in German, was expressly designed to confirm in detail "all rights, obligations agreements, etc. concerning" the property purchase at issue. J.A. at 181. At one point, the Letter clarifies that the "auftragsverhältnis" between Willingham and the Tschiras

---

* The Honorable Floyd R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. In this opinion, Corim, Inc. and Willingham will be collectively referred to as "Appellants" and individually referred to as "Corim" and "Willingham."

2. In this opinion, Klaus and Gerda Tschira will be collectively referred to as the "Tschiras" and individually referred to as "Klaus" and "Gerda."

3. The HONORABLE THOMAS A. HIGGINS, United States District Judge for the Middle District of Tennessee.

would be governed by German law, but that American law would control all other aspects of the deal. The meaning of "auftragsverhältnis" is at the heart of this appeal. The Tschiras contend that the parties intended for the term to create a German law "mandate relationship," similar to an agency relationship in the United States, with all of its concomitant fiduciary duties, between the persons involved. Willingham, on the other hand, strenuously asserts that the term was solely meant to convey that the parties stood in the position of buyer and seller and that the "auftragsverhältnis" actually means "contractual relationship."

In late 1990, Schenk brought Klaus a Corim brochure about One Church Street, a Nashville, Tennessee property. The brochure advertised One Church Street as a five story commercial building erected in 1872, available for $1,985,000. The pamphlet described the property as having "a special architectural character" and said the building had been "recently renovated with substantial effort and expense." J.A. at 358. Corim guaranteed rent payments of $158,000 the first two years of the lease back, $165,000 the third and fourth years, and $171,000 the fifth year. The Tschiras expressed interest, and soon thereafter they received the Letter from Willingham. The document guaranteed that the building would be "insured sufficiently, so that it can be restored from the proceeds of the insurance in the event of destruction or damage." J.A. at 182. The final paragraph of the letter states that "[t]he powers of attorney given to us will only be used according to the forthcoming agreement." *Id.* Willingham had signed the copy of the Letter he mailed to the Tschiras. After reviewing the available materials, the Tschiras decided to invest in the property. They did not, however, secure independent counsel for the deal, visit One Church Street prior to the purchase, or obtain an appraisal from any source other than Corim.

The Tschiras and Corim subsequently entered into a Purchase Agreement for the Nashville property. They simultaneously executed a Management Agreement for the building. As arranged by the signatories, the Tschiras' funds for the purchase were to flow through a fiduciary account maintained at First Federal Bank in Brunswick, Georgia. The Tschiras sent a letter to First Federal authorizing the bank to release the funds only upon presentation of, among other things, documents showing a transfer of the property to the Tschiras by warranty deed, confirmed by a title insurance binder. In the Tschiras' absence, Willingham orchestrated the property's closing on December 14, 1990.

Several years later, the Tschiras discovered other details surrounding the sale of the Nashville building. Namely, they learned that two closings occurred on December 14, 1990. In the first, One Church Street, Inc., a shell corporation owned by Corim and Willingham, purchased the property from its owner, First Atlanta Services Corporation. The selling price in this deal was $774,000. In the second transaction, One Church Street, Inc. sold the building to the Tschiras for $1,985,000. Schenk, the German national who referred the Tschiras to Corim, received a $79,400 commission from Corim for his part in the sale. Willingham admitted at trial that the Tschiras were never advised that the shell company purchased the property and then resold it for an instant profit of $1,211,-000. When the Tschiras became aware of these facts in the Spring of 1992, they canceled the Management Agreement with Corim and brought the instant lawsuit. In 1995, the Tschiras sold One Church Street for $665,000.

In their Complaint, the Tschiras claimed that Corim and Willingham breached a fiduciary duty they owed to them pursuant to the "mandate relationship." In a separate count, they asserted that the Appellants committed the tort of intentional misrepresentation. Two key pieces of evidence at trial were the title and liability insurance policies issued for One Church Street. The title insurance policy Willingham forwarded to the Tschiras indicated that the Ticor Title Insurance Company had provided protection up to $1,985,000. In actuality, Lisa Wilson, the local branch manager of Ticor, testified that the policy the company extended for the property was for only $774,000. Evidence also suggested that the liability insurance policy the Tschiras received, which purport-

ed to originate from Palmer Cay/Carswell and indicated coverage in the amount of $1,985,000, only provided protection up to $774,000.

Over Willingham's objection, the Tschiras also introduced evidence of a scheme perpetrated on other SAP co-founders who invested with Corim. The artifice involved the payments Corim "guaranteed" to investors who leased back to the commercial real estate company. For a period of time, Corim failed to make these payments to certain property owners. To conceal this fact, Corim, which managed the investors' bank accounts within the United States, falsified bank statements before transferring them to the owners. For example, a genuine bank statement for one investor dated January 27, 1990, shows a balance of $3,063; the falsified statement is identical in all respects except that it reports a balance of $136,136.16. The Tschiras were not victimized by this practice, but the scheme was the subject of a separate lawsuit against Corim. Willingham claims that he took no part in the deception, but that it was instead undertaken by a renegade employee acting outside the scope of her authority. However, the practice continued for some months, until Willingham had the funds to cover the unpaid rents.

Following a week long trial, during which the district court decided as a matter of law that the term "auftragsverhältniss" as used by the parties created a mandate, or fiduciary, relationship between Willingham and the Tschiras, a jury returned a verdict against Corim and Willingham on both causes of action. The jury awarded $1,420,000 in compensatory damages against Corim and Willingham, as well as $1,000,000 in punitive damages against Corim and $750,000 in punitive damages against Willingham. The district court later awarded prejudgment interest in the amount of $599,791. Corim and Willingham now appeal the judgment entered against them, raising several grounds for reversal.

## I. DISCUSSION

On appeal, Willingham and Corim claim the district court erred in several respects. First, they claim the district court erred when it instructed the jury that a mandate or fiduciary relationship existed between Willingham and Tschira. Second, they assert that the district court committed error in allowing the Tschiras to introduce into evidence bank statements tending to show Corim's deception of other investors. The Appellants also claim the district court should have directed a verdict in their favor on the issues of intentional misrepresentation and punitive damages. They further allege that the district court committed error when it refused to answer several questions posed by the jury during deliberations. Finally, Appellants argue that the district court erred in refusing their post-trial motion to interrogate the jury. We address each of these issues separately.

### A. Mandate/Fiduciary Relationship

 Willingham and Corim argue that the district court erred in applying German law to determine what type of relationship existed between the parties. Paragraph Nine of the Letter from Willingham to Tschira reads as follows: "Für das Auftragsverhältnis zwischen uns, unserer Firma und Ihnen gilt deutsches Recht, im übrigen U.S.-Recht." J.A. at 172. Appellants claim that the sentence translates: "For the contractual relationship between us, our company and yourself, German law is applicable, otherwise U.S. law." Appellants' Br. at 16 (emphasis omitted). The Tschiras, on the other hand, interpret the phrase to read: "For the mandate relationship between us, our company and yourself, German law is applicable, otherwise U.S. law." Tschiras' Br. at 6. Appellants argue that, because the letter from Willingham to the Tschiras is not a contract, the parties did not enter into a valid choice of law agreement and Tennessee law, rather than German law, should therefore apply. Appellants further argue that under the law of either Tennessee or Germany, a fiduciary relationship did not exist between Appellants and the Tschiras. We review a district court's factual determinations for clear error and review its conclusions of law *de novo*. See *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir.1996). The district court's determination of foreign law is a question of

law subject to *de novo* review. *See id.;* Fed. R.Civ.P. 44.1 (West 1997).[4]

▮ Under Tennessee law, parties are to free to choose the law of a particular jurisdiction, provided that the choice of law is made in good faith and the chosen law bears a reasonable relation to the transaction. *See Goodwin Bros. Leasing, Inc. v. H & B Inc.,* 597 S.W.2d 303, 306 (Tenn.1980). Regardless of what type of relationship Paragraph Nine seeks to establish, it certainly appears that the parties intended for German law to apply to that relationship. Appellants, however, now argue that German law does not apply because the letter from Willingham to the Tschiras is not a valid contract. They claim that Willingham did not intend for his Letter to the Tschiras to be regarded as a contract and, thus, the requisite "meeting of the minds" was not present. However, Willingham's trial testimony establishes that he intended for the November 26 Letter to be binding, and he intended for German law to apply. The following colloquy establishes Willingham's intent:

Q. At the Jacksonville meeting Mr. Wipfler presented the [Letter] to you, right? In substance?

A. No, sir. He talked about various points. And ... it was decided the best thing to do would be to have him write a letter to me outlining what he would like to have confirmed, and that is the beginning of what became the [Letter].

Q. Did he mention German law in Jacksonville, German law government?

A. He felt like the contract should be governed under German law and that's my interpretation of the sentence that refers to the purchase agreement, which is to be concluded, will be subject to German law. I saw nothing to our detriment in that. We fully intended to live up to the letter and spirit of that contract, and did.

J.A. at 928–29. Furthermore, the Tschiras' expert on German law, Dr. Thomas Verhoe-

ven, testified that the Letter confirmed an oral agreement that the parties made previously. In the following testimony Dr. Verhoeven explains the significance of the Letter:

Q. ... Under German law, does a letter such as the [Letter] have to be countersigned by the recipients, in this case the Tschiras, in order to be a contract?

A. First of all, as I mentioned at the beginning, there is no legal requirement under German law that something has to be done in writing as far as the conclusion of an agreement is concerned. If you look to the [Letter], it's a confirmation letter, so you would even not [sic] expect that it contain[ ] a counter signature because it reads as a confirmation of something which had been agreed upon by the parties orally.

 &#42; &#42; &#42; &#42; &#42; &#42;

Q. So far as you know from your knowledge of the documents and facts in this case, is there any reason why a German court would not construe the [Letter] as a contract binding on [Willingham and the Tschiras?]

A. To be precise, the [L]etter itself is not the contract. The contract would be what the parties had agreed upon before, I especially mean orally.

Q. And this confirms it?

A. So this would only be a means of evidence. But to complete your question, among businessmen there is the doctrine that if somebody is sending in a confirmation letter and the German businessman is not objecting against it, then even if it changed what had been agreed before, the contents of the confirmation letter [are] binding.

J.A. at 781–82. Based on the testimony elicited at trial, as well as the contents of the Letter itself, which was signed by Willingham and then sent to the Tschiras, we

---

4. Rule 44.1 provides:

 A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source,

including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

conclude that the district court correctly determined that the parties agreed to apply German law in construing their relationship.

■ We now turn to the question of whether the term "auftragsverhältniss" created a "mandate relationship," as claimed by the Tschiras, or a "contractual relationship," as claimed by the Appellants. Rule 44.1 permits the court to "consider any relevant material or source, including testimony," in determining matters of foreign law. Fed. R.Civ.P. 44.1. At oral argument in this case, we requested that parties provide the court with English translations of relevant German law. Neither party provided information which fully complied with this request. After our own exploration of German law on the subject, as well as a review of the information provided by the parties, especially the expert testimony presented at trial, we conclude that the district court correctly concluded that the German term "auftragsverhältnis," as used in the Letter, means "mandate relationship." First, Dr. Verhoeven[5] testified that he concluded that "auftragsverhältnis," as used in the Letter, means "mandate relationship." Dr. Verhoeven stated that, although the term "auftrag" has several meanings in the German language, under the German Civil Code, the term means "mandate." Indeed, the translation of the German Civil Code in the record translates "auftrags" as "mandate." *See* Forrester, Ian S., *The German Civil Code* §§ 662, 667 (North—Holland Publishing Co.1975).

Appellants argue that we should consider the ordinary meaning of "auftrag" rather than the legal meaning because as an ordinary businessman, Willingham would not have considered the legal meaning of the term. We are not persuaded by Appellants' argument. Dr. Verhoeven placed special significance on Paragraph Ten in concluding that the term created a mandate relationship. Both parties agree that Paragraph Ten *is* translated as follows: "The power of attorney given to us can only be exercised within the limits of the anticipated [or existing] agreement." Appellants' Br. at 16; Tschiras' Br. at 8.[6] Dr. Verhoeven reasoned that the existence of a power of attorney further evidenced the parties' intent to create a mandate relationship. Based on the overall tenor of the Letter, we conclude that the Letter expressed a previously agreed-upon intent to create a mandate relationship.

Under German law, the "mandate relationship" is very similar to the agency relationship in American law. The German Civil Code provides that in a mandate relationship, "the mandatary binds himself gratuitously to take care of some matter for the mandator entrusted to him by the latter." *The German Civil Code* § 662. Based upon this understanding of the term "auftragsverhältnis," the district court instructed the jury that Appellants owed the Tschiras a fiduciary duty. Having conducted our own examination of the term and its significance under German law, we conclude that the district court correctly instructed the jury on this issue.

---

5. We credit Dr. Verhoeven's testimony over Appellants' expert, Dr. Nicholas Vazsonyi. Dr. Vazsonyi admitted he is an expert on German literature and culture rather than law, testified that he has had no legal training, never had looked at the German Civil Code prior to his involvement in this case, and has no idea what legal significance a power of attorney has in German or American law. When asked whether he was reading the German Civil Code or its Commentary, Dr. Vazsonyi responded: "Well, I can point to what I was reading, but since I'm not a lawyer, all I knew was that I was reading it from this big thick book that claimed to be the German law." J.A. at 751. Based on Dr. Vazsonyi's obvious lack of familiarity with the legal issues involved in this case, we did not place any significance at all on his interpretation of the term "auftragsverhältnis." Following oral argument in the case, Appellants provided the court with

an opinion letter from a German law firm which stated that "auftragsverhältnis," as referenced in the November 26th Letter, probably did not create a mandate relationship. The firm's opinion is well-reasoned considering its limited familiarity with the case. The author of the letter, however, hesitates to draw definite conclusions because of the lack of complete information regarding the long-term relationship of the parties. Based on this hesitancy, compared with Dr. Verhoeven's confidence regarding the meaning of the letter, we decline to rely on the law firm's reading of the correspondence.

6. In German, Paragraph Ten reads: "Von der uns erteilten Vollmacht werden wir nur im Rahmen der bevorstehenden Vereinbarung Gebrauch machen." J.A. at 172.

## B. Bank Statements

■ During Willingham's cross examination, the Tschiras' attorney sought to introduce bank statements which Corim sent to other investors. These other investors were co-founders of SAP and entered into similar investment opportunities with Corim in which Corim sold the investors property and guaranteed that the investors would earn a certain percentage of profit from Corim's rental of the properties. Corim set up bank accounts for the investors into which it would deposit the guaranteed rents. The bank would send the statements to Corim; Corim would then send the statements to Schenk who, in turn, provided the statements to the investors in Germany. Willingham testified that for some time in 1990 Corim sent the investors false bank statements which showed that the accounts were receiving the guaranteed rents when, in fact, they were not. Willingham, however, claimed that a Corim employee was responsible for this practice and that, as soon as he learned of it, he immediately began to replace the money owed to the investors. Willingham testified that it could have taken anywhere from six months to a year to replace the funds. During cross-examination of Willingham, the Tschiras' attorney entered into evidence two bank statements, both in the names of Hans–Werner Hector and Josephine Hector. The statements were identical in all respects except one—the statement sent to the Hectors reported a balance of $136,136.36, while the original statement reported a balance of $3,063.

The district court allowed the Tschiras to introduce the bank statements into evidence. However, the court gave the following limiting instruction to the jury:

Ladies and gentlemen, you're hearing testimony with regard to certain bank statements that were altered and sent to the investors known as the SAP investors in Europe. I instruct you first that there's no suggestion that false bank statements were sent to the plaintiffs in this case, Mr. and Mrs. Tschira.

Secondly, you will recall at the beginning of the trial I gave you certain preliminary instructions. Among those instructions were that if evidence during the course of the trial was received for a limited purpose only, and you were instructed that it was to be received for a limited purpose only, it was your duty to follow that instruction.

Now I instruct you at this time that the testimony you are receiving about the altered bank statements is being received for a limited purpose only. It is being received for such probative value as you may attach to it on the issues of motive, intent, preparation, plan, opportunity and the absence of mistake or accident. It's for those purposes. You can consider it for those purposes, for whatever value, that is, probative value you may attach to it.

I instruct you this evidence is not being received as proof that because these items were altered that the disputed insurance policy, title insurance policy and certificate of insurance were altered. You're not to consider it because this occurred, that that necessarily occurred. You're to receive it for the limited purpose only of such value as you may think this proof has on the issues of whether the opportunity existed, whether there was a motive or intent, opportunity to do such things as well as on the issues of whether it was by accident or mistake or other innocent reason. So you'll consider this proof for these limited purposes only.

Trial Tr. at 968–69. Appellants claim that the district court erred in admitting this evidence because the evidence (1) was not relevant; (2) was unfairly prejudicial; and (3) tended to confuse the issues. Appellants also argue that the district court erred in admitting the evidence because the court did not allow the jury to determine whether the employee who authorized the false statements to be sent to the investors was acting within the scope of her employment when she did so.

■ We first address Appellants argument that the evidence regarding the other SAP investors was not relevant. Along with this issue, we consider Appellants' concern regarding the involvement of the Corim employee who may or may not have been acting within the scope of her employment when

she authorized or requested that false bank statements be sent to the other SAP investors.[7] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. "Because the district court has broad discretion to determine matters of relevance, this court reviews for an abuse of discretion that affected the substantial rights of a party." *See Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 587 (6th Cir. 1994).

We conclude that the district court did not abuse its discretion when it determined that the evidence regarding the other SAP investors was relevant to the issues involved in this case. Willingham admitted that he became aware of this practice after it had been going on for approximately a year. When he found out about the practice, he did not discipline the employees involved; he did not notify the investors that they had been deceived; he did not put an end to the practice until several months later when he had accumulated enough money to replace the amounts owed to the investors. The district court correctly determined that the evidence was relevant to issues involved in this case. That the employee who initiated this conduct may have acted beyond the scope of her employment is not an issue in this case, and it certainly is not an issue Appellants had the right to be determined by a jury. Willingham's admitted participation in this deception was sufficient to render the evidence relevant.

 The district court determined that the evidence in question was admissible under Fed.R.Evid. 404(b). Rule 404(b) provides:

> **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformi-

ty therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b) (West 1997). The court engages in a three-step analysis when reviewing the admission of evidence under Rule 404(b). *See United States v. Comer,* 93 F.3d 1271, 1277 (6th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 595, 136 L.Ed.2d 523 (1996). First, we review the district court's determination that sufficient evidence supports the occurrence of the other acts for clear error. *See id.* We then review *de novo* whether the district court correctly determined that the evidence was admitted for a legitimate purpose. *See id.* Finally, we review for an abuse of discretion "the district court's determination that the 'other acts' evidence is more probative than prejudicial under Rule 403." *Id.* (quotation and citation omitted).

Because Appellants do not specifically challenge the first two parts of the three-step analysis, extended discussion of those issues is not warranted. After a careful review of the record, we find that sufficient evidence supported the existence of the other acts. Willingham himself testified as to the existence of the false statements and his failure to notify the investors once he learned of the deception. Willingham further testified that it took several months to replace the funds, from which one can infer that, during that time, he allowed Corim to continue to send false statements to the other SAP investors. We also conclude, after a *de novo* review, that the district court correctly determined that the evidence was offered for a legitimate purpose. The practice of sending false bank statements to the other investors tends to establish the existence of a plan or scheme whereby Corim would provide false documentation of transactions to convince investors that their dealings with Corim were more profitable than they, in fact, were.

---

7. Appellants' characterization of this issue is not entirely clear in their briefs. We view it as an issue of relevance because, presumably, if the employee was acting beyond the scope of her employment, the evidence would be less likely to have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. However, as we point out above, if other evidence exists tying Appellants to the false statements that were provided to the other SAP investors, the evidence would be relevant.

Therefore, the evidence was offered for the legitimate purpose of showing a common scheme or plan. *See* Fed.R.Evid. 404(b); *United States v. Ausmus*, 774 F.2d 722, 727–28 (6th Cir.1985).

■ Appellants contend that the district court abused its discretion when it admitted the evidence relating to the other SAP investors because the evidence was unduly prejudicial and was likely to confuse the jury. "Trial courts have broad discretion in deciding the issue of admissibility under Fed. R.Evid. 403." *Laney v. Celotex Corp.*, 901 F.2d 1319, 1320 (6th Cir.1990). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir.1988) (quotation omitted). First, Appellants argue that the probative value of the evidence was substantially outweighed by its prejudicial effect because it "suggested to the Jury a *connection,*" Appellants' Br. at 43, between the parties and events of the lawsuit involving the other investors and the parties and events involved in this case. To be sure, the evidence suggests a connection between the cases on at least some level, or the evidence likely would not be considered relevant. Our preceding discussion explains why this connection drawn by the evidence is, however, permissible under Rule 404(b). Furthermore, any undue prejudice or confusion which could have resulted from the admission of the evidence was alleviated by the district court's admonition to the jury to consider the evidence only for its limited purpose. We conclude that the district court properly admitted the evidence relating to the other SAP investors.

## C. Intentional Misrepresentation and Punitive Damages

■ Following the jury's determination that Appellants committed fraud or intentional misrepresentation,[8] Appellants filed a motion pursuant to Fed.R.Civ.P. 50(b) requesting that the district court direct judgment as a matter of law in their favor. The district court denied the motion, concluding that "there was a legally sufficient evidentiary basis for the jury's findings." J.A. at 661–62. When reviewing a Rule 50 motion questioning the sufficiency of the evidence in a diversity case, we apply the same standards the forum state would apply. *See K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir.1996). Under Tennessee law, when ruling on a Rule 50 motion, "the trial court should consider all evidence introduced by the non-moving party, draw all reasonable inferences from that evidence, disregard all countervailing evidence and, if there is any competent evidence about which reasonable minds could differ, the trial court should overrule the motion." *See Harrogate Corp. v. Systems Sales Corp.*, 915 S.W.2d 812, 817 (Tenn.Ct.App.1995). On appeal, "we need show no deference to the trial court's assessment of the sufficiency of the evidence before a jury." *K & T Enters.*, 97 F.3d at 176 (emphasis omitted).

■ To establish a cause of action for fraudulent misrepresentation, a plaintiff must prove: (1) an intentional misrepresentation, (2) knowledge of the representation's falsity, (3) the plaintiff reasonably relied on the misrepresentation and suffered damages, and (4) the misrepresentation relates to an existing or past fact. *See Hill v. John Banks Buick, Inc.*, 875 S.W.2d 667, 670 (Tenn.Ct.App.1993). The evidence presented at trial was sufficient to uphold the jury's finding of fraudulent misrepresentation. Willingham promised the Tschiras a fair market price for the property they were buying,[9] as well as adequate title

---

8. "[I]ntentional misrepresentation is an element of fraud, although the two are often used interchangeably in common parlance." *Fairway Village Condominium Assoc. Inc. v. Connecticut Mutual Life Ins. Co.*, 934 S.W.2d 342, 347 (Tenn.Ct. App.1996).

9. Willingham claimed at trial and on appeal that he was forthright about his plan of making a profit from buying the property and then selling it to the Tschiras for a higher price. However, Wipfler and Schenk both testified that Willingham told the group at the meeting in Walldorf, Germany that he would be making his profit from renting the property for a higher price than Willingham paid the investors in rent. The jury apparently found that Wipfler and Schenk were more credible than Willingham. "The weight

and property insurance to cover any losses. The evidence was sufficient to establish that, at the time Willingham promised this to the Tschiras, he knew the property's value was closer to $774,000, which is the price Corim paid for the property. The jury could have reasonably found that Willingham had knowledge of the false title and property insurance policies which only covered the property up to $774,000, while the Tschiras believed the property was covered up to $1,985,000—the price they paid for the property.

 Appellants argue that the representations were not material because they provided a "guaranteed" return on the Tschiras' investment through the rental income. However, the jury could have reasonably found otherwise. The Tschiras believed they were paying "fair market price" for the purchase of the property, *in addition to* receiving a guaranteed return on their investment. The Tschiras believed, and the jury could have reasonably concluded, that the Tschiras actually paid $1,211,000 over the fair market price of the property and therefore lost that amount on their investment at the time of purchase. Finally, we conclude that the evidence was sufficient to support the jury's determination that the Tschiras reasonably relied on the representations and suffered damages as a result of that reliance. The Tschiras believed, based on the letter of November 26, 1990, that Willingham was their trusted agent and would not sell them property for above the "fair market value." As a result of that belief, the Tschiras paid well over the "fair market price" for the property, thereby losing a great deal of money on the "investment." Based on the evidence presented at trial, the district court did not commit error in denying Appellants' Rule 50(b) motion.[10]

---

and credibility of a witness['s] testimony are matters entrusted exclusively to the jury as the triers of fact." *State v. Robinson,* 930 S.W.2d 78, 82 (Tenn.Crim.App.1995); *accord United States v. Wynn,* 987 F.2d 354, 358 (6th Cir.1993).

**10.** Appellants also challenge the district court's refusal to grant their Rule 50(b) motion on the issue of punitive damages. Under Tennessee law, "punitive damages are available in cases involving fraud, malice, gross negligence, oppression, wrongful acts done with a bad motive

## D. Jury Deliberations

 In their post-trial motions, Appellants also requested a new trial under Fed. R.Civ.P. 59, based on the district court's refusal to answer several questions posed by the jury during deliberations. The jury asked the following questions of the court:

1. [W]hat amount did the plaintiffs invest in One Church Street for repairs, et cetera, after withdrawing from the agreement and prior to selling the property? . . .

[2. H]ow much income did the plaintiffs receive from Corim, Incorporated, on One Church Street prior to the withdrawal of the agreement? . . .

[3. C]an the plaintiffs be awarded the costs of the trial, attorney fees, et cetera?

Trial Tr. at 1160–61. The district court determined, and the parties agreed, that the third question was a question for the court, not the jurors. On the first two questions, the court decided that the jury had already heard the evidence. Upon Appellants' objection and request that the jury be read back evidence pertaining to the questions, the district court stated:

> Well, the point is that if we start reading evidence back, there's always the risk of undue emphasis being given to just a portion of the evidence without all the evidence. If you have evidence in chief read, then it's a question of evidence on cross-examination, and whether there's evidence from another party, and you get involved in a very tedious process of the court reporter trying to find in a five-day trial those portions of the record.
>
> And it seems to me, lawyers, that the most satisfactory answer is to tell them

---

or so recklessly as to imply a disregard of social obligations, or where willful misconduct or an entire want of care raises a presumption of conscious indifference to the consequences." *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 900 (Tenn.1992). Based on our conclusion that the evidence supported the jury's finding of fraudulent misrepresentation, we similarly find that the evidence supported the award of punitive damages.

they have heard the proof, it's their duty to recall the proof and determine to the extent they can from the evidence as they recall it.

Trial Tr. at 1165. The district court then instructed the jury that, because a transcript had not yet been prepared for the case, it would have been extremely difficult for the court reporter to read back the requested testimony. The judge then instructed the jury to "search your own recollection of the proof. You're the judges of the facts and you have heard the testimony and make your determination on what you recall the testimony to be." Trial Tr. at 1168.

■ We review the district court's decision not to re-read trial testimony to the jury for an abuse of discretion. *See United States v. Padin*, 787 F.2d 1071, 1076 (6th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986). In exercising its discretion, the district court should consider "the reasonableness of the jury's request and the difficulty of complying therewith." *Id.* (quotation omitted). There are two inherent dangers in reading testimony in response to a jury's questions: "First, undue emphasis may be accorded such testimony. Second, the limited testimony that is reviewed may be taken out of context by the jury." *Id.* (citations omitted). The district court noted its concern with these inherent dangers as well as its concern with the excessive time reading those portions of the testimony would have taken. The district court's consideration of these matters was well within its discretion. We, therefore, affirm the district court's denial of Appellants' Rule 59 motion.

### E. Motion to Interrogate the Jury

■ Following the jury's verdict in favor of the Tschiras, Appellants filed a motion to interrogate the jury. The Appellants motion sought to have fifteen questions answered on various aspects of the jury's ver-

dict. The district court refused to allow such an interrogation. We review this refusal for an abuse of discretion. *See United States v. Franks*, 511 F.2d 25, 38 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975). A principal purpose of refusing a request to interrogate a jury following the verdict is to prevent "fishing expeditions in search of information with which to impeach jury verdicts." *United States v. Davila*, 704 F.2d 749, 754 (5th Cir.1983). Appellants appeared to be on such an expedition when they filed their request to ask fifteen questions [11] regarding the jury's verdict. Accordingly, we conclude that the district court did not abuse its discretion when it denied this request.

## II. CONCLUSION

For the reasons set forth in this opinion, we affirm the district court's judgment in all respects.

---

11. Examples of the questions Appellants requested to ask of the jury include: (1) "What duties did the jury determine defendants owed to the plaintiffs?"; (2) "What act, or acts of the defendants did the jury determine to be intentional misrepresentation[s]?"; (3) "How did the jury arrive at the determination that any misrepresen-

tation that might have been made, was made intentionally?"; and (4) "How much weight did the jury give to defendants' exhibit explaining how Corim arrived at the selling price of the building?". Appellants' Mot. to Interrogate the Jury at 1–2.