**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0054n.06

**No. 08-5234**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| ROBERT KESSLER, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **Jan 28, 2010** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| PATRIZIA RICCARDI, | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before: NORRIS, CLAY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.   Dr. Patrizia Riccardi sued Dr. Robert Kessler, alleging that he retaliated against her after she reported him for sexual harassment.  Kessler, in turn, sued Riccardi for defamation, alleging that her reports against him were false and damaged his reputation and mental health. Kessler prevailed in both suits, and Riccardi, now proceeding *pro se*, claims the district court erred by: (1) granting partial summary judgment to Kessler on her retaliation claim; (2) resolving three evidentiary motions incorrectly; (3) granting Kessler's pre-verdict motion for judgment as a matter of law on the remainder of her retaliation claim; and (4) denying her post-verdict motion for judgment as a matter of law on Kessler's defamation claim.  We affirm, except with regard to the pre-verdict judgment as a matter of law on the retaliation claim, which we reverse and remand.

I.

Riccardi, a psychiatrist, began a medical-research fellowship in the Radiology Department at Vanderbilt University in September 2003. She worked under the direct supervision of Kessler, a radiology and psychiatry professor. When Riccardi accepted a part-time faculty position in July 2004, she agreed to fund a percentage of her salary with grant money, which she could accomplish either by obtaining her own grants or by contributing to the grants of other faculty members, who would then allocate a portion of their grant funding to her salary.

During Riccardi's first two years at Vanderbilt, she worked almost exclusively with Kessler, researching a number of mental-health disorders using Positron Emission Tomography, a neuroimaging technology. Riccardi claims she came to Vanderbilt specifically to work with Kessler, as he was a recognized scholar in PET imaging, the field in which she too wanted to specialize. As Riccardi understood it, Kessler planned to include her on all of his grants and help her with grants of her own so that she could reach her funding goal.

The nature of Riccardi and Kessler's relationship differs dramatically depending on whom you ask. Riccardi alleges that Kessler began sexually harassing her in November 2003, which gradually worsened and culminated in an attempted rape in June 2005 when they were in Toronto attending a professional conference. Kessler denies these allegations, contending that the two began an on-again-off-again affair in January 2004 that lasted until June 2005, and that he, not Riccardi, was the victim of the physical altercation in Toronto.

The Toronto incident prompted Riccardi to report allegations of Kessler's sexual harassment and attempted rape to Vanderbilt in June 2005. University authorities conducted an investigation, ultimately concluding that the evidence was insufficient to substantiate Riccardi's claims. During the investigation, Kessler told Vanderbilt authorities that he and Riccardi had engaged in a consensual sexual relationship. The university thereafter strictly limited Kessler's interaction with Riccardi, instructing him to avoid being alone with her and not to communicate with her directly. Because much of Riccardi's work required the assistance or supervision of Kessler, the parties worked out a system whereby Riccardi and Kessler would communicate by e-mail and copy each other's attorneys on all of their messages.

In June 2006, Riccardi filed a sexual harassment complaint that named Vanderbilt, Kessler and radiology department chair Dr. Martin Sandler as defendants. She raised a state-law claim for retaliation against Kessler individually, along with claims for battery and intentional infliction of emotional distress stemming from the physical altercation in Toronto. Kessler countersued, alleging defamation as well as assault and battery claims based on the Toronto incident. Riccardi settled her claims against Vanderbilt and Sandler before trial.

Riccardi alleged—and continues to claim on appeal—that Kessler unlawfully retaliated against her by inadequately supporting her grant-writing efforts and by refusing to include her on a number of his own grant proposals. The district court granted partial summary judgment to Kessler regarding his conduct on five of the grants, finding that Kessler presented legitimate non-retaliatory reasons for his actions and that Riccardi had not shown a genuine factual issue as to whether the

stated reasons were pretextual. As for his conduct on two of the research projects, however, the district court found that Riccardi established a question of fact sufficient to warrant a trial.

With the issues whittled down to Riccardi's remaining two allegations of retaliatory conduct, Kessler's defamation claim and both of their personal-injury claims, the case proceeded to trial. At the close of the evidence and before the case went to the jury, the district court granted Kessler's motion for judgment as a matter of law on Riccardi's remaining two allegations of retaliation, determining that Riccardi neither established that she suffered any adverse action nor demonstrated that the explanations Kessler gave for his conduct were pretextual.

The jury found in Kessler's favor across the board, awarding him $15,000 in damages for battery, $10,000 in compensatory damages for assault, $500,0000 in actual monetary damages for defamation, $1,500,000 in other compensatory damages for defamation and $950,000 in punitive damages. App. 1236–39.

Riccardi filed a post-verdict motion for judgment as a matter of law, claiming that Kessler failed to present evidence of actual damages resulting from the defamatory statements. In the alternative, she requested a new trial or a remittitur of the compensatory and punitive damages for defamation. The court granted her motion with respect to the $500,000 in actual monetary damages but denied it as to the other compensatory damages and the punitive damages, on the condition that Kessler accept a remittitur decreasing the compensatory damages award from $1,500,000 to

$250,000 and the punitive damages award from $950,000 to $250,000. Kessler accepted the remittitur and the district court entered a final judgment.

## II.

Riccardi first claims that the district court erred in granting partial summary judgment to Kessler on her retaliation claim. Tennessee state law prohibits individuals from "retaliat[ing] or discriminat[ing] in any manner against a person because such person has opposed a [discriminatory] practice." Tenn. Code Ann. § 4-21-301. A plaintiff alleging a retaliation claim under the statute must, as with a Title VII claim, show "(1) that she engaged in activity protected by the THRA; (2) that the exercise of her protected civil rights was known to the defendant; (3) that the defendant thereafter took a materially adverse action against her; and (4) [that] there was a causal connection between the protected activity and the materially adverse action." *Allen v. McPhee*, 240 S.W.3d 803, 820–21 (Tenn. 2007). If the plaintiff makes the required showing, the burden shifts to the defendant "to articulate a legitimate, non-discriminatory reason for" the adverse action. *Id.* at 821. And if the defendant satisfies that burden, the burden shifts back to the plaintiff, who "must present evidence demonstrating that the articulated reason is pretextual and that the defendant's action was actually motivated by a desire to retaliate against the employee." *Id.*

Kessler does not dispute that Riccardi demonstrated the first two elements of her retaliation claim—reporting her allegations to Vanderbilt and filing a complaint against Kessler amounted to protected activities and Kessler knew about them. See R.133, 35. As for the five allegedly

retaliatory actions on which the district court granted summary judgment, however, Riccardi's attempt to show retaliation falters after that point.

A.

Riccardi alleges that Kessler retaliated against her by "providing inadequate assistance with" her "Sex Differences Grant proposal." Riccardi Br. 45. The facts, as relayed by Riccardi, show that several months after filing suit, Riccardi sought Kessler's assistance as she prepared to submit the grant proposal. Riccardi gave Kessler a draft of the proposal on a Friday, believing that doing so would give Kessler sufficient time over the weekend to review it before the Monday submission deadline. Still awaiting his response on Sunday, Riccardi asked a university employee to call Kessler on her behalf at about 3:00 that afternoon. Kessler responded by emailing Riccardi at 4:20, telling her that he "only now had the opportunity to carefully read" her grant and offering several paragraphs of comments and suggestions. App. 726–28. The eighty minutes he spent reviewing and commenting on the draft departed from his normal practice of spending one to two days reviewing a grant proposal.

Riccardi has not shown that Kessler's failure to respond more quickly—or more substantively—constituted retaliatory conduct. Regardless of how quickly Kessler reviewed Riccardi's grant, the undisputed facts show that he complied with her request to review her draft and provide comments before the Monday deadline. He suggested ways Riccardi might "give the reviewers greater confidence that [her] study would produce significant results," App. 726–27,

pointed her to recent scholarship in the area and highlighted sections that "could be explained more clearly," App. 728. Riccardi has no evidence to substantiate her claim that this critique "was not meaningful and was not provided in good faith." Ricc. Br. 46. And though Kessler ordinarily might have spent more than eighty minutes reviewing grants, Riccardi offers no evidence to show that the explanation he offered for his conduct—that he had not had time to review the grant—was pretextual. Riccardi, not Kessler, imposed the time constraints, and a jury could not reasonably infer that his decision not to spend most of the weekend reviewing her grant constituted retaliatory conduct.

B.

Riccardi claims that Kessler retaliated against her by providing "insufficient assistance" with the grant proposal she submitted to the NIH to obtain funding to study autism. Ricc. Br. 48. Kessler provided Riccardi with "one page" of comments after reviewing her draft proposal. Ricc. Br. 49. The grant was not funded, and the reviewers commented that the background section was "difficult to follow" and "not cogent," App. 721, and that the entire proposal needed "careful editing," App. 719. As Riccardi sees it, the reviewers' comments demonstrate that Kessler retaliated against her, because he—as an NIH grant reviewer himself—should "have warned [her] that the reviewers would make such comments and suggested meaningful ways to avoid such criticism." Ricc. Br. 49.

Riccardi has not demonstrated that Kessler's supposedly inadequate assistance constitutes an adverse employment action sufficient to sustain a retaliation claim. Kessler's "one page"

email—too short to be helpful by Riccardi's estimate—suggested that she correct various organizational and substantive problems, including some of the same problems mentioned by the reviewers. *See, e.g.*, App. 715–16 (suggesting she edit the background section to make it more "tightly focused"). Riccardi offers no evidence that Kessler's feedback amounted to an adverse action: She does not show, for example, that Kessler's comments on grant proposals prior to her complaint were significantly more helpful, nor does she suggest what "meaningful" comments should have looked like.

C.

Riccardi fares no better on her claim that Kessler retaliated against her by refusing to act as the "mentor/sponsor" of her application for a Young Investigator Award sponsored by NARSAD, an organization that funds psychiatric research projects. The NARSAD application requires a "mentor/sponsor letter" "from an on-site mentor/sponsor . . . describing the mentor's/sponsor's commitment to facilitate the specific research proposal." R.82-2, 2–3. Kessler declined Riccardi's request that he assume that role, stating that, in light of their strained relationship and her refusal "to communicate with [him] except by email," he "d[id] not see how [he] could effectively fulfill the duties required of a Mentor/Sponsor for this project." App. 730. Based on his own experience as a member of the NARSAD scientific council as well as a conversation with a "senior member" of the organization, he believed that he "would be required to disclose [their situation] to NARSAD" in a Mentor/Sponsor's letter, which could have threatened her chances of receiving the grant. R.82, ¶ 19.

Riccardi challenges the district court's conclusion that these were legitimate, non-retaliatory reasons for declining her request. She says that his reason for declining the mentor/sponsor role *must* be pretextual because the limits on their communication did not hamper other projects they worked on together. But evidence about other projects does not help her show pretext, because the record shows that the NARSAD mentor/sponsor role is more intensive than an ordinary co-investigator role. *See* R. 82, ¶ 19, *see also* App. 729. Riccardi rejoins that she did not ask Kessler to be her "mentor," just her "senior collaborator," which purportedly would not have required as much one-to-one contact. Ricc. Br. 51–52. No matter the title, she does not dispute that Kessler would have had to submit a letter outlining his plans to support her project and disclosing their limited ability to communicate. Her only response is that Kessler obtained much of his understanding about the role of a mentor/sponsor from conversations with an undisclosed member of NARSAD, which Riccardi classifies as inadmissible hearsay inappropriate for consideration in a summary judgment ruling. But because Kessler testified about his conversation with a senior member of the NARSAD council to show the basis of his belief that he could not help her, not for the truth of the matter asserted, the conversation is not hearsay and the district court did not err in considering it. *See* Fed. R. Evid. 801(c).

D.

Riccardi claims that Kessler retaliated by not naming her as a co-investigator on his Vanderbilt Discovery Grant proposal for a project on "dopamine and depression." Ricc. Br. 55. "[I]t was a very small grant," Kessler explains, "with a very limited budget and only the very most

essential people could be included on it," R.89-2 at 837, he "had to have someone from the psychiatry department who would recruit the depressed subjects" and "[t]here was not enough money in the budget for anyone else." R.89-2 at 837. In addition, "the grant program required participation by two Vanderbilt departments," so "the . . . investigator on the budget [other than Kessler] had to be from a department other than radiology"—the department in which Kessler and Riccardi worked. R.82, ¶ 23. He added that, at the time he prepared the grant, "collaboration" with her "had been exceptionally difficult," presumably because of the restrictions placed on their interaction, R.89-2 at 837, and explained that the project was small enough that he would perform the PET scans himself. *Id.* Other than claiming that this grant was related to a larger NIH grant on which she was a co-investigator and that she would have worked for free, Riccardi offers no evidence to show that these non-retaliatory reasons were pretextual. Ricc. Br. 56–7.

E.

Riccardi argues that Kessler wrongfully withdrew his support of her "Borderline Personality Grant" proposal "as a result of [her] complaint." Ricc. Br. 41–42. According to Riccardi, Kessler agreed to serve as her co-investigator for the grant in March 2005, several months prior to her June 2005 complaint to Vanderbilt authorities. He reviewed the draft proposal, provided Riccardi with feedback and even offered her money from his own grant funding so that Riccardi could obtain preliminary data for her proposal. Riccardi finished her proposal by June 2005, but decided to wait to submit it until the next funding cycle rolled around in early 2006.

As she prepared to submit her proposal during January and February of 2006, Riccardi, through Kessler's secretary, asked Kessler to confirm that he would serve as co-principal investigator by signing paperwork for the proposal. Kessler's attorney informed Riccardi that Kessler "[did] not intend to do this." App. 635. Riccardi submitted the grant without Kessler's (or any other faculty member's) assistance, and the grant was not funded. One grant reviewer commented on her junior status, noting her failure to list "either an established psychiatric co-investigator, or a PET co-investigator . . . as part of her team." App. 704.

Kessler provides a legitimate non-retaliatory reason for his refusal. The project, Kessler says, involved administering medicine that could exacerbate the test subjects' underlying conditions, and he was concerned about patient safety. In addition, he claims that Riccardi did not provide him a copy of the proposal in January 2006, so he could not, without running up against ethics rules, sign off without thoroughly reviewing and understanding the "essential aspects" of her project. R.82, ¶ 15. These reasons must be pretexual, Riccardi insists, because Kessler reviewed the proposal approximately ten months earlier and agreed to serve as co-investigator without any mention of safety or ethical concerns. But this argument does not satisfy her burden of showing pretext, as she has not offered proof that the proposal remained in the same form as it was in June 2005, claimed that she provided Kessler with a copy of the grant in January 2006 or shown that it would have been ethically appropriate for Kessler to sign off on the proposal without re-reviewing it.

Riccardi suggests in her reply brief that Kessler's safety concerns about the grant are pretextual because Kessler "agreed to serve as co-investigator on two of [her] other grants . . . which

were similar in nature to the [grant] in terms of any potential 'safety issues.'" Ricc. Reply 3. Because she did not raise this point in the district court or in her initial brief, she has forfeited it. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 354 (6th Cir. 2009).

III.

Riccardi challenges three of the district court's evidentiary rulings, which we review for abuse of discretion. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 378 (6th Cir. 2009).

A.

The district court did not err in permitting testimony that Riccardi told Kessler about her prior sexual relationships. Though "evidence offered to prove" any alleged victim's "other sexual behavior" or "sexual predisposition" is generally inadmissible, the district court may allow such evidence if "its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." Fed. R. Evid. 412(a)(1)–(2), (b)(2). Kessler's defense to Riccardi's allegations was that the two were in a consensual sexual relationship. Eliciting testimony about what Riccardi told Kessler about her past sexual relationships, then, was probative as to whether the two had the type of personal relationship in which Riccardi would disclose intimate details of her personal life. We cannot say that the district court exceeded its discretion in determining that the probative value of evidence going to the linchpin of Kessler's defense substantially outweighed the potential for unfair prejudice to Riccardi.

Riccardi's alternative argument that the district court should have excluded the evidence on Rule 404(b) grounds adds no merit to her objection. Rule 404(b) prohibits "evidence of other . . . acts" "to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). It does not, however, bar evidence of prior acts for other purposes—such as to show that Riccardi shared personal details of her life with Kessler.

B.

Nor did the district court abuse its discretion in denying Riccardi's motion to admit evidence that Kessler shifted assets and accounts to his wife's name and sold property around the time Riccardi made her complaint to Vanderbilt authorities. Riccardi suggests that the evidence should have come in to show that Kessler "engaged in a pattern or scheme to evade responsibility for his actions" once he suspected Riccardi might bring claims against him. Ricc. Br. 69. Even if this evidence could have shown that Kessler wanted to "evade responsibility" by protecting his assets from an unfavorable judgment, it would have been of little relevance to the ultimate issues in this case—whether Kessler committed battery, intentionally inflicted emotional distress or retaliated against Riccardi. The district court therefore did not abuse its discretion in omitting evidence of such attenuated relevance.

C.

Riccardi's remaining evidentiary challenge—that the district court incorrectly permitted "hearsay evidence consisting of statements [Kessler] made to others . . . that he had an intimate

relationship with [Riccardi]," Ricc. Br. 63—is unavailing. The district court permitted Kessler to testify that he told his boss and his wife that he was having an affair, citing the prior consistent statement exemption from the hearsay rule. *See* Fed. R. Evid. 801(d)(1). An out-of-court statement "consistent with" in-court testimony is admissible under Rule 801(d)(1) if the out-of-court statement "is offered to rebut an express or implied charge against the declarant of recent fabrication." *Id.* Throughout the trial, Riccardi tried to prove that Kessler was lying when he claimed that their relationship had been consensual. Therefore, Kessler offered testimony that he told his wife and his boss of their purported affair months before Riccardi complained to Vanderbilt authorities for the proper purpose of rebutting Riccardi's claim that he lied about the affair to protect himself. No doubt, it is possible that Kessler made up the affair and confessed it to those close to him to take the sting out of Riccardi's future sexual harassment claims, but the theory is sufficiently speculative that we cannot say the district court abused its discretion in rejecting it.

Riccardi gets nowhere with her challenges to other witnesses' testimony regarding what Kessler told them about his relationship with Riccardi. Because her attorneys did not object at trial to Martin Sandler's and Craig Oxford's testimony, she has forfeited this argument. And because her attorneys elicited testimony from Ingrid Kessler about Kessler's out-of-court statements, R.264, 756–57, Riccardi cannot now maintain the court erred in allowing that testimony. *See All Am. Life & Cas. Co. v. Oceanic Trade Alliance Council Int'l, Inc.*, 756 F.2d 474, 479–80 (6th Cir. 1985).

IV.

Riccardi next challenges the district court's denial of her post-verdict motion for judgment as a matter of law on Kessler's defamation claim. She claims that Kessler did not present a legally sufficient evidentiary basis for a reasonable jury to find that he suffered actual injury as a result of her allegations, which she discussed with other colleagues at Vanderbilt and reported to the American Association of University Women. (She does not contest the sufficiency of the evidence as to any of the other elements of a defamation claim, nor does she argue the reasonableness of the punitive damages award.) Taking, as we must, the "strongest legitimate view of the evidence in favor of" Kessler, we may reverse the district court's denial of Riccardi's motion only if "a reasonable mind could draw but one conclusion": a conclusion in Riccardi's favor. *Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1248 (6th Cir. 1984).

To recover damages on a defamation claim under Tennessee law, a party must prove "actual injury" resulting from the allegedly defamatory statements. *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 417–19 (Tenn. 1978). "[A]ctual injury is not limited to out-of-pocket loss," and may "include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* at 416. But "anger, mere annoyance or loss of peace of mind" may not be sufficient to demonstrate actual injury. *See Murray v. Lineberry*, 69 S.W.3d 560, 565 (Tenn. Ct. App. 2001).

Viewing the evidence in Kessler's favor, a jury could reasonably have concluded that Kessler experienced sufficient anguish, humiliation and suffering as a result of Riccardi's allegations to amount to a compensable "actual injury." Kessler testified that Riccardi's allegations of rape were

"extremely stressful"; were "like a cloud that hangs over you and pushes you down and zaps your energy"; made him "depressed somewhat, anxious somewhat" and "unable to work to get [his] funding going"; caused him to "wonder . . . how many jobs, positions [he was] not being considered for because people think [he's] a rapist, a crazy person, a sexual harasser"; R.242 at 101–102, and triggered ongoing problems sleeping at night, *id.* at 139.

In addition to Kessler's testimony, other record evidence lent support to the reasonableness of the jury's conclusion that Kessler's injuries went beyond mere embarrassment, annoyance or anger. Riccardi's allegations, for one, prompted a lengthy internal investigation into Kessler's personal life at Vanderbilt. When she recounted her allegations to the American Association of University Women, the organization posted them on its website. Kessler's colleagues ran across the website and alerted him to it, bolstering the legitimacy of Kessler's belief that the allegations were widely known and that Riccardi's allegations had diminished his reputation. *See Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 165 (Tenn. Ct. App. 1997) (finding actual injury in part because the evidence showed that plaintiff believed his reputation was tarnished by the defamatory statements). In light of the web publication and the intensive investigation prompted by Riccardi's complaints, this case is different from Tennessee cases in which the plaintiff suffered only "mere annoyance" or "humiliation" insufficient to prove actual injury. *See Handley v. May*, 588 S.W.2d 772, 776–77 (Tenn. Ct. App. 1979) (no actual injury when there was "no evidence whatsoever of any impairment of reputation and/or standing in the community" and the evidence showed that plaintiff was "under mental stress and strain independent of the defamatory utterance"); *Dowlen v. Mathews*, No. M2001-

03160-COA-R3-CV, 2003 WL 1129558, at *5 (Tenn. Ct. App. Aug. 25, 2003) (no actual injury from defendant's false statements about a police officer because he did not demonstrate harm "ris[ing] above anger, mere annoyance or loss of peace of mind," nor did he show that the false statements led to the officer undergoing an "internal investigation," "disciplinary action," or any "cuts in pay, demotions or suspensions"). Because the evidence was legally sufficient to sustain a damages award, the district court did not err in denying Riccardi's motion.

V.

Lastly, Riccardi claims that the district court's decision to grant Kessler's pre-verdict motion for judgment as a matter of law on Riccardi's remaining two allegations of retaliation—those surrounding Kessler's decisions not to include Riccardi on his "Methamphetamine Grant" and on his "Risperidone Contract." When reviewing a judgment as a matter of law in a diversity case, "we apply the same standards the forum state would apply," *Tschira v. Willingham*, 135 F.3d 1077, 1087 (6th Cir. 1998), which means "tak[ing] the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor . . . [,] disregarding all countervailing evidence" and reversing the judgment "unless reasonable minds could reach only one conclusion from the evidence." *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). As to both the Methamphetamine Grant and the Risperidone Contract, her challenge has merit.

A.

Kessler submitted the Methamphetamine grant proposal to the NIH in October 2005. It named several other Vanderbilt faculty members as co-investigators but did not include Riccardi. At summary judgment, Kessler offered two non-retaliatory reasons for his conduct: (1) that Riccardi did not have the required expertise in the grant's subject matter; and (2) that the grant's small budget could not accommodate Riccardi. Riccardi countered that these reasons were pretextual, because she had always been on his grants before, even if she did not have the necessary expertise, and because, as the principal investigator, Kessler could have adjusted the budget to include her or given her the opportunity to work on the grant without giving her a salary. Based on Riccardi's reasoning, the district court identified two issues of material fact that precluded summary judgment: (1) whether Riccardi, regardless of her level of expertise, had been included on all of Kessler's NIH grant proposals involving PET scans up until she complained to Vanderbilt authorities in June 2005; and (2) whether Riccardi reasonably expected that Kessler would include her on all of his grants involving PET.

The evidence submitted at trial did not resolve these questions. Kessler testified that from the time Riccardi began work at Vanderbilt in September 2003 until June 2005, Riccardi worked on every grant he submitted. He did not refute Riccardi's claim that her lack of expertise never stopped Kessler from involving her on projects prior to June 2005 or grapple with her point that he cited one of her papers in the grant application, suggesting that she at least had some expertise to offer the study. The evidence presented at trial also did not settle whether Riccardi expected to be included on all of Kessler's PET-related grants. Kessler, in fact, lent some support to the

reasonableness of her expectation, agreeing that he "probably" explained to Riccardi before she arrived at Vanderbilt that she would work on his grants, App. 1202. And though Kessler now points to Riccardi's testimony that she worked on another researcher's grant during that time period to disprove the reasonableness of Riccardi's belief, that proves only that she did not work solely on Kessler's grants, not that she did not expect to be on all of his grants. Because the same questions of fact that precluded summary judgment remained unresolved at the close of the evidence, and because "doubt exist[ed] as to the conclusions to be drawn from [the] evidence," *Johnson*, 205 S.W.3d at 370, the jury, not the district court, should have determined whether Riccardi's claim had merit.

Kessler tries to save this part of the judgment by claiming that the lingering questions about pretext do not matter, because Riccardi failed to show an "adverse action" and therefore never established a *prima facie* case of retaliation. The evidence showed that the grant was never funded, Kessler argues, so failing to include Riccardi on the grant was not an adverse action, as it did not hinder her in the end from meeting her funding requirements. The district court apparently agreed, noting when granting the Rule 50 motion that any "damage" Riccardi incurred was "ethereal and speculative." App. 1232.

But Kessler—and the district court—overlooked a crucial factual issue. The grant might not have received funding, but Riccardi testified that even working on an unfunded grant proposal would have advanced her career. From that, a jury reasonably could have found that being excluded from career-building, albeit unfunded, grant work "well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination," *Allen*, 240 S.W.3d at 820 (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), and therefore constituted an adverse action. Kessler's rationale—that his actions did not *really* harm Riccardi because she never would have received funding from the grant anyway—contains another flaw. It is after-the-fact reasoning that contains its own dose of speculation about whether the action was adverse to Riccardi *at the time it* occurred. *See Burlington Northern*, 548 U.S. at 72–73 ("an indefinite suspension without pay could well" be an adverse action "even if the suspended employee eventually received backpay").

## B.

The district court erred along similar lines in granting Kessler's Rule 50 motion with respect to the "Risperidone Contract." In December 2006, Kessler signed the contract, which provided funding to conduct PET scans of individuals with schizophrenia. Kessler did not seek Riccardi's—or anyone else's—assistance in preparing the funding application, claiming that "it was far simpler just to write it" himself. R.89-2 at 13. The district court denied summary judgment, noting that the project was similar to other work he and Riccardi had worked on together and that, although Kessler prepared the application on his own, another colleague, Dr. Robert Shelton, was listed as a co-investigator, which "[gave] rise to an inference that Kessler's stated reason for not including" Riccardi—"that it was just too much trouble"—was pretextual. R.133, 34.

At trial, Kessler testified that no one other than himself was listed on the Risperidone Contract, purportedly to provide a legitimate non-retaliatory reason for excluding Riccardi. When Riccardi's counsel confronted him with the fact that Shelton was listed as a co-investigator with a salary on the "proposal transmittal form," R.242 at 107–09, Kessler claimed that another Vanderbilt employee—not he—put Shelton's name on the application. Even though Riccardi's name was not on the proposal, Kessler continued, she would not have been excluded from working on the Risperidone Contract once work began on it, but work had been delayed by the company funding the project.

Kessler's testimony that nothing would have prevented Riccardi from working on the contract once work began does not dispel the inferences of pretext identified by the district court at summary judgment. Riccardi claims that Kessler retaliated against her by leaving her name off the proposal, and a number of facts related to this complaint came out at trial that the jury should have had the opportunity to weigh, namely: (1) that Riccardi was included on all of his PET-related projects between September 2003 and June 2005; (2) that he did not ask her to work on either of his PET projects afterward; (3) that the Risperidone contract was related to their other work; and (4) that someone else's name was placed on the proposal, suggesting that he readily could have done what he previously always had done: include Riccardi's name.

Kessler opposes this conclusion on two fronts, claiming that a jury could not have concluded that Kessler's conduct was an "adverse action" and that Riccardi offered nothing to support her claim of pretext. Leaving Riccardi's name off the project was not an adverse action, Kessler insists,

because work on the project was delayed. But as with the Methamphetamine Grant, this reality does not undermine Riccardi's *prima facie* case. There was evidence after all that having one's name on projects is a career benefit. As to pretext, Kessler insists that Riccardi cannot rebut a purported non-retaliatory reason for his action—that he did not exclude Riccardi from work because no one had started working on the project. But any project delays do nothing to eliminate the harm of being left off the grant. The district court erred when it did not allow the jury to decide these lingering questions.

(Kessler, we should note, appears to dispute the premise of our reasoning, claiming that "Riccardi does not complain that her name was not included on the Risperidone Contract . . . only . . . that she did not do any work on that Contract," Kessler Br. 40. We are not sure where Kessler gets this idea, as the cited transcript pages do not mention the Risperidone Contract and our review of the trial transcript reveals nothing to that effect. But even if Riccardi at some point suggested that she was only complaining about not getting to work on a yet-to-begin project, there is certainly contrary testimony indicating that Kessler's decision not to include her name on the contract formed the basis of her complaint and her papers before both the district court and this court confirm as much, *see* R.95, 38–39, Ricc. Br. at 61, Ricc. Reply at 19 ("[Kessler's] retaliatory conduct was in excluding me from the Risperidone contract proposal.").)

Two final points. One, the reader may wonder why the parties—and the district court—treated the various adverse actions in this case as distinct claims as opposed to one claim with aggregated harms. We had the same question. The answer is that this is how the parties presented

the case. And because the parties chose to structure the case in this manner and because no party has complained about this aspect of the case on appeal, we need not decide whether their assumptions about the appropriate structuring of this case are correct.

Two, we have asked Robert Rack, the head of the Office of Circuit Mediators, to contact the parties to determine whether they may wish to mediate the two claims left in this case. The mandate as a result will not issue until the parties successfully mediate the case or determine that they no longer wish to try to resolve their differences through court-sponsored mediation.

VI.

For these reasons, we affirm the judgment, except with respect to the district court's grant of judgment as a matter of law on the two retaliation claims tried before a jury, which we reverse and remand.